We'll wait till they get cleared up. All right, final case this afternoon is number 1431303, Gibson v. United States, Mr. Pommentier. Good afternoon, Your Honor. It's good to see you all again. I'm Mike Pommentier, de Gravel, Pommentier Hotels and Fugue from Baton Rouge. First, just for the record, I would like to say this is not my normal voice. I made sure of the ages of the panel members before I said that I was going to say I sound like Jimmy Durante today rather than… You can get some water if you need it. I may get that in a moment, Your Honor. Thank you. The reason why I check age is because, believe it or not, most people don't know who Jimmy Durante is. They don't. They're below 50. We are here today because of the Federal Tort Claims Act case, and this is not my first rodeo on this matter either. I have the dubious honor of having had four previous cases, Wyatt v. U.S. I was part of the Mr. Robinson v. U.S. Recently, Anderson v. U.S., and so the definition of insanity that some people have quoted before, which is to say actions repeated expecting different consequences or different results each time, and getting the same, of course, is a definition of insanity. But I would suggest, Your Honors, this afternoon that this case is different from those which have previously come before you. Each of you have had extensive experience in the DFE area of the Federal Tort Claims Act. And the reason why it's different is because we don't even, we shouldn't even get to the DFE examination because this is a motion for summary judgment. In the motion for summary judgment that we brought, they were cross motions, by the way, in the motions that were brought in this case, we argued two things. We argued first that under the rules that are established under Gobert and the Berkowitz cases, those that you all are familiar with, the two-part analysis, that the first part is where we should stop. That is, whether or not the action of the employee violated a specific policy. This is, although it's a question of law as to whether or not DFE applies, it has to be based on an issue of fact. And in this case, the facts are disputed as to whether or not the actual violation took place, but not as to whether, in our view, not as to whether a policy existed at this FEMA sales location in Baton Rouge. And what we mean by that is this. There was, and there is in the record, extensive testimony by a supervisory employee that said, in no uncertain terms, it was our policy not to assist people getting in and out of the trailers that we were selling. This is a sale of FEMA trailers post-Katrina. There were several different models of trailers that were out there. The one that my client was looking at was basically a mobile home, and it didn't have stairs, and so it had a height you had to negotiate before you could get into the trailer. And he was injured when, after having been provided with a ladder, he fell and broke his leg in severe injuries. The person who provided the ladder was a representative or employee of FEMA, and the FEMA rule, according to the FEMA executive, whose name is Jones, Mr. Jones testified in his deposition on numerous occasions that the rule was that, in no uncertain terms, our employees were not to assist people getting in and out of the trailer. Now, if we are going to apply the Gobert, I guess you would say, if you call it Gobert, if we are going to apply the Gobert duality analysis, we can stop at the first one, because here the only evidence of the record is that there was a rule that the employees were supposed to follow, not to assist. It wasn't his deposition pretty equivocal. I forget some of the modifying words you just used. But didn't Jones acknowledge that it was common courtesy and ladders were frequently provided? Whatever policy there was, was not written. I think that's acknowledged, is it not? No. It is. It's subsequently written, but before it was not written. At the time relevant for this case, it was not a written policy. Well, although we would suggest that the policy, what his testimony was, Your Honor, was, we say, unequivocal, that long before the written policy, it was the policy not, and all of them learned, all of the employees learned not to assist. When you say learned that, it seemed to me Jones was almost saying the opposite, that he thought it was a common courtesy and ladders were frequently provided. I mean, you know the testimony better than I do, the deposition better than I do, but isn't that the thrust of what he said as well, despite whatever he said about the policy? Well, I would disagree that that's the thrust of what he says. He equivocally says that would be common courtesy, but he doesn't specifically state that they provided these ladders as common courtesy. They are in the record, I think at page 984, at best equivocal statements. But the second point I would make, Judge Southwick, is that's a, so what? It is that there was a policy. If there was a violation of the policy, even in common courtesy, and believe me, it's not easy for me to say this, but if you back up and look at what's appropriate or what's common decency, common decency would have the FEMA people putting ladders out there that are not subject to falling. Common decency would have there be some kind of appropriate behavior, under State standards anyway, for people entering a premises and not providing a stairway to get in and out. We don't make that argument, but relative to the, quote, common courtesy, there was no common courtesy out there. It seems to me that the policy you're talking about was exceedingly impractical with these FEMA trailers. I think your client himself, his testimony, he had seen several trailers before the one that he fell from, and he would generally climb into them maybe by sitting down on the threshold first and moving his legs around and then, but maybe using a ladder to get out. So an awful lot of people could not get into these trailers without some sort of assistance. So I don't quite understand how policy came about other than to avoid litigation, I guess, down the road. Well, that is it, Judge. But nonetheless, the evidence seems uncontroversial since it came from the witness that you're relying on, that ladders were, again, I don't want to overstate, but were at times provided regardless of the policy, and it sounds like Jones himself was quite aware of that. So where does that leave us? You have what you say is an unequivocal policy but only stated orally by Mr. Jones. Is that enough in your mind? Do you have some case law that supports even though the policy was widely or at times violated, that's still good enough to allow this case to go forward? I'd first say that Mr. Gibson shouldn't be visited with the inappropriate conduct of violating internal policy because it was routinely done. Well, if it's a discretionary function exception, it covers discretionary functions even if discretion be abused. Yeah, I'm very familiar, Your Honor. I know you are. And it is also, of course, the source of a huge body of law that's evolving even as we speak in the United States. I mean, the Mr. Goh case was a perfect example of that, one in which this Court struggled and reversed itself over what the meaning of discretionary function is. But here, Judge Jones, we don't think that you're going to be faced with that because there is a policy. And the question from Judge Southwick is, does it have to be written? And the answer to that should be no. Now, what is the policy? Because I understood it, and maybe I just missed something here. You have interpreted the policy as do not assist anybody. They're saying the policy is do not assist them in or out. In other words, they're slicing it between it's okay to lend the ladder, but it's not okay to support the ladder. That's the way I understood their position. That kind of—this is why these cases are such a challenge to this Court because that's splitting hairs from our perspective. I mean, isn't that what the distinction is right now or not? No, Your Honor, with all due respect, I believe what we're looking at is—and we are saying to you today— that what you should look at is the testimony of a key witness in a summary judgment proceeding. Now, I know that you're probably thinking, well, the same judge who denied your summary judgment and granted theirs is going to be hearing the facts, but she'll get to see the actual witnesses. This is a trial on depositions that you see before you. Well, I was asking you about the policy. Am I correct that you have two different—you and the government have two different views of the policy? Yes. Okay. And your view is— They're saying it didn't exist because it wasn't written, and at least they're implying that. And from our perspective, I don't know how you could get any stronger than the deposition of Mr. Jones. Well, it seems to me there's still an avenue for you to have a case if there was an unwritten policy. You do not help people in and out of the trailers, but, in fact, they were providing ladders in a negligent way. That is our case. I thought you'd agree with that. It's one of the two perspectives on the case because we don't rely only on the existence, because we could see, for example, if you said, well, because it's not written, it's not a policy, even though, you know, the record is filled with evidence that it is. If you said—if you told us that this was not enough and we're going to look at the second prong, the second prong of the Garber test is met by us here as well, which is to say that this isn't within the ambit of the protection that the act that enabled FEMA was designed to protect against. This is where I do, I will acknowledge, get somewhat frustrated, although the redness of my face has to do with the cortisone I got yesterday so that I could speak today. I'm not—it's frustrating from the standpoint of a plaintiff attempting to at least get his case before the court. Well, what's the best case in the Fifth Circuit for your position going forward? It's the Indian towing case, Your Honor, from 1955, which basically said that you Coast Guard, you took on the responsibility of maintaining this lighthouse and you didn't do it right. What about our Theriault case about the underwater obstruction? I'm familiar with it, and I know that that was a discretionary function that survived—I mean, did not survive from a plaintiff's standpoint. Right. You asked me for the best cases, and that's one. I also think that Berkowitz and Gobert are good for plaintiff. They established this double test, and in this case, we argue that both those tests are met by us, but we say, with all due respect to the trial judge, you shouldn't bounce us on some injudgment because these depositions have all this contradictory testimony. Well, you're not—I mean, the issue of policy as such goes to the court's jurisdiction, so you can't go to a jury on whether there's a policy, can you? Well, I don't get to go to a jury at all because it's an FTCA case. Right, right, right. But that's the reason I made the point, Your Honor. Think about you sitting as a district court judge having already ruled on a summary judgment. You may ask, well, why do you even bother? She's going to put the record—here's what this case is about to me. I want to be able to put Mr. Jones, Ms. Johnson on the stand and let this judge, who has extensive courtroom experience herself, see the credibility or not of those witnesses and to see my—I mean, granted, he's a big old guy, 6'4", 400-pound, you know, Mississippi guy who, you know, did deal with trailers, but this was not him maintaining trailers. This was him looking for trailers to sell because he was going to buy it and then wind up selling it. And so he was invited onto the premises. There were duties owed under Louisiana law. There would be duties owed that would assimilate into the Federal Tort Claims Act, and those duties are only eliminated by the discretionary function exclusion if there was discretion here. Number one, there wasn't because of the policy that they had internally, and we can prove that, although it is equivocal in terms of the proof. Number two, this isn't the kind of thing that was designed to be protected against anyway because if you get down to that level of minutiae, frankly, what's become of the Federal Tort Claims Act is there is no Federal Tort Claims Act. Well, but the Gilbert case goes pretty far in saying that operational activities are within the scope of the exception. It does, and daily activities. We don't refute that, Judge, but this one was one that was so nondiscretionary it doesn't – I mean, where do we stop is, for example – I agree. I mean, it's gotten very far afield from the whole concept of social, economic, and political policy. I agree with you there, but that's what the term operational activity seems to encompass. But this isn't us meddling. This is one example of one case in which one person did something wrong. If – You have a chance to get some water. Okay. Thank you. And rebuttal. Ms. Murray. Good afternoon, Your Honor. Katherine Murray on behalf of the United States. I want to first turn to Judge Southwick's questions about what exactly was stated by Mr. Jones and Ms. Johnson. They both testified about what the policy was. It's apparent, and I do have some record cites from you, that they had learned from training – and this is in pages 9, 10 through 9, 12 of the record – that they learned from training what they were supposed to do in showing the trailers to the prospective – I would call them loosely customers because they're selling them via GSA auction as is – but that for people who were prospective buyers. The actual sales took place online. They were auctions that were bid upon. And what was happening in these situations was mainly that these prospective customers, before they bid on any certain trailer, because many of them are identical in structure and form, would go inspect certain numbers to see what sort of condition they were in. So the purpose of them going there was just to inspect the condition of the various trailers. Mr. Jones, Herman Jones, and Ms. Joan Johnson were both salespeople. There were only three salespeople for the total staff at the Sherwood site. Relevant to this, and I think it's really relevant to the discretionary function exception, is that they had hundreds and hundreds of trailers on 100-plus acres of land in the Sherwood site, and they could have from 20 to 100 trailers on sale at any time. So it was a fluid process. We don't really need to know that. All we need to know about is what's the policy. The policy is stated, and the policy was orally, at least to an extent, was a policy. These were sales instructions to the sales employees, and it was done in training. And Mr. Jones stated that, he said, we didn't give them ladders. And this is on page 910 of the record. We didn't give them ladders. It was their responsibility to retrieve the ladder, set the ladder up, and get in the trailer themselves. And he was asked by Mr. Palmentier, the ladders were provided by the facility, correct? And he answered, yes, the ladders belong to the facility. On page 923, again, they're still talking about how the ladders are provided. He said, this is Mr. Johnson's, I'm sorry, Mr. Jones' response to Mr. Palmentier's question. If they wanted to use a ladder, we did not stop them from using our ladders. It was a common courtesy. It wasn't. We were instructed from the training that we received prior to taking over the sales. We were not supposed to assist the customers in and out of the trailers. Common courtesy, that's what happened. We allowed the trailers to use, providing the customers with the trailers. I mean, with the ladders was not something that we were instructed to do. We were instructed to not assist customers in and out of trailers. Well, here's the problem I have with the government's trying to turn this into a discretionary function, either in terms of a policy or susceptible to policy analysis. Any business invitee in any private company throughout the United States who provided a ladder that failed or that somebody didn't spot the ladder could be liable for negligence. Isn't that precisely the kind of situation that the Tort Claims Act was intended to, of liability that it was intended to confer on the United States? In the specific context of ladders, I understand the Court's concern and I understand that the district court also addressed this question and looked at the Cole case. The Cole case talks about defining the questions . . . Well, they were defusing a bomb or they were looking for forensic evidence at a bomb site. Yes, Your Honor, but it was all whether the methods that they used to look for the forensic evidence was within their general policy. In this question, they've made a policy and both Ms. Johnson and Mr. Jones testified that it was impractical and logistically impossible for them to actually attach stairs onto these different trailers. I understand that, but what I don't understand is my understanding here was that this was a ladder, not just a stepstool. It was a stepstool. And the picture site is on page 1102 of the record. There is a picture of the step ladder, Your Honor. A step, but it's like a V-shape. It is, Your Honor. It's a V-shape. All right. Okay. So it's a step ladder because it has at least three steps. It has, according to the testimony, it was three steps plus the top rung. Well, you know, don't most step ladders have warnings pasted all over them, do not use without somebody spotting below? Your Honor, I'm not aware of whether this one particularly had these warnings on it or whether they generally do. Quite frankly, it sounds possible to me, implausible. Well, you must never change a light bulb then. I try not to, Your Honor. Yeah, well, you're lucky. But I will say this is that the concern that they had, and it came forth in the testimony, was they were concerned more with the FEMA employees either getting hurt themselves or hurting somebody else by trying to assist them in and out of the trailer. The testimony was that most of the people, and Ms. Johnson said that most of the people, I'll give that site, did not, they either brought their own ladders or they didn't use them. Most people didn't use them. And that was on pages 499 and 500 of the record. Mr. Jones testified that he had only assisted in between five to ten students. I still don't think that, I mean, again, so that would imply that there's not a particular policy that the whole thing is, you know, such as sort of what they choose to do under the circumstances and therefore not a policy. But the policy was not to provide ladders, and they were clear that that was not the policy. The policy was to let them use them if they wanted to use them. And to that extent, it was the customer's choice whether to scoot up on the ladders, to leave the site and go get the ladder, or to use the ladder themselves. And, Your Honor, in the context of their desire and their expediting the sale of these trailers while ensuring maximum security for their employees and safety for their employees and getting this done as fast and as easily as possible. I think you're doing a fantastic job of putting lipstick on this pig, and I'm not sure how I come out on it. But to deck all of that in, you know, the realm of policy judgment when every premises owner would have had a duty to not be negligent in assisting a customer climbing up onto something is just interesting. And I think, Your Honor, and the reason I brought up the hundreds and hundreds of trailers is because they're not a premises owner, and I think this gets back to the heart of why they're even selling these trailers is because they provided hundreds and hundreds and thousands or however many they provided free of charge to people during Hurricane Katrina and the other subsequent catastrophes of the Gulf Coast, and they're trying to liquidate them as cheaply as possible with minimal resources, which the agency does have, obviously. And I made the point of three salespeople to show that it would have been almost logistically impossible not only to put the steps on the trailer, but also to have a sales force with the limited resources and people they had available to spot everybody who's going from trailer to trailer. So it seems to me that here's where we are based on what we've heard today, and you're free, obviously, to differ with me or supplement it. So it seems to me that both you and opposing counsel agree that there was a policy of not assisting the buyers. And let me finish, and then I certainly want to give you a chance to elaborate or disagree. And so opposing counsel, after saying that, says that this shouldn't be in the summary judgment posture because there was a policy, but there's a factual material dispute of material fact as to whether an employee violated that policy. Tell me how it is that that's not where we are in this case. Because I think that the in and out of the trailer is, I'd say it's policy loosely. It's what they were instructed to do in the sales team, and that was their instructions on how they were to assist customers. And from the context of it being a policy or a mandated policy of FEMA at that point, we don't have that. Well, but the very words were, I believe, that you quoted them were, we were not supposed to assist. That tells me that, I mean, if I were an employee, I would read that as a rule. Fair enough, Your Honor. The boss's policy. And that was how they both of them read it, that they were not supposed to. And what I can take at least from the context of the conversations was both employees understood, and if you read it, I've given you the cites to Mr. Jones' testimony. Ms. Jones, Ms. Johnson talked about what she understood the policy to be, which is very similar on pages 499 to 500 of the record, so that's where you can go to see. She talks a lot more briefly about it. But they understood that they were just physically not supposed to get them in and out of the trailer. Okay. Well, I mean, if we were to agree, I don't know what we're going to decide here, but if we were to agree that there was a policy of not assisting buyers, then isn't it correct that there is a dispute of material fact which would defeat summary judgment as to whether any employee, one or more employees, violated that policy? Mr. Gibson's testimony was that Ms. Johnson offered him the ladder. He brought the ladder and carried the ladder to the site. He was unsure who actually placed it at the step of the ladder. He couldn't remember. At one point he said she did. At one point he couldn't remember. She denies that she said he carried it. But at any rate, he did say that once he got to the site, he was the one who secured and moved it around to make sure that it was steady. He's the one who got in without any assistance from her. And then he also says that she was 20, 40 feet away from the entrance of the mobile home at the time that the accident happened. If assistance is getting in and actually getting physically in and out of the trailer, she did not assist him in doing so. All right. But a finder of fact at trial should be the one to make that determination, right? It's not right for summary judgment. If it's viewing it in the light most favorable to the plaintiff, Mr. Gibson, he still fails because the facts I just cited are his testimony. And his testimony was that he was the one who secured the ladder and made sure it was secure. He's the one who went up unassisted. She did not assist him going up. She was 40 feet away when he was going down. He wanted her to come hold the ladder. She didn't. So the testimony is absolutely she was unassisted. But wouldn't there still be a fact issue as to whether providing a ladder and making it available constitute assistance in violation of the policy? To the extent that they both understood that the policy allowed them to do that, no, because the policy was actually physically in and out of the trailer. You're saying they're both vague about it, and then you say but it was physically in and out of the trailer and that was that. They were both unequivocal that they did not provide ladders, that they would be used if the person wanted to use them. That they were unequivocal in. Both of them said we didn't actually provide access. They weren't bought, and both of them testified that they weren't bought for the purpose of helping people get in and out of the trailers. They weren't bought for the customer's purpose at all. They were bought for the salespeople or anybody on the FEMA staff at Sherwood. So they were not ladders that were sitting against a FEMA wall saying, hey, take a ladder if you need to get it. That's not how that happened. And there are no other questions of the Court I think I've given. I will just point to the Vis Amp case because it does go into it. Mr. Palmentier, as cited in my brief, talked about how specific do we go in the discretionary function. In the Vis Amp case, it's a Fifth Circuit case, this Court found that the marshals who did not seat belt in some prisoners when they were traveling and subsequently were rear-ended and the prisoners were injured, that act or that decision to not buckle up the prisoners in the back of the van was protected by discretionary function for safety concerns. So it goes down to a very specific detail level because seat belting may have required them to either get too close to the prisoners if they would have had to interact in a way. And for officer safety purposes, they found that that was a legitimate exercise of discretion under the circumstances. And I will just submit for closing that I would submit in this case, again, the policy of not physically assisting or helping people in and out, as they understood it was so that the FEMA employees would not get hurt. For that reason, that's a safety concern, which is likewise one that, of course, this Court has addressed in other cases. Thank you. All right. Thank you. Okay. Mr. Palmentier. I'm going to quote from Herman Jones' deposition and I'm going to quote from the questioning done not by myself but by the lawyer in charge of that case at the time who is now retired, Mr. James Nelson. And this is a quote, and I would give you a record entry, but I don't have the actual record with me. It's at page 118 of the Herman Jones' deposition, Your Honor. I'd be glad to contact the Court to tell them where in the record that would be. Question by Mr. Nelson. Okay. Let me see if I can rephrase it. Hypothetically, if you assisted someone going in and out of a trailer on that lot, would you be in compliance with or in violation of the policy? This is a question asked by them. In violation of it. Do you know if you could lose your job if you didn't do your job well? Yes, is the answer. This is a policy. This is the supervisor saying this is a policy. So we believe that it was violated, but where the vagueness comes in, unfortunately, is there's two different versions of how the accident actually happened, whether or not Ms. Johnson was facilitating, supposed to be standing by but talking on her cell phone. All of that is facts that should be heard at trial, realizing it. Your opponent, is it the key facts on what actually happened there are not disputed? Who placed this ladder next to the building, that there was no assistance physically holding the hand, standing in the ladder as he went in, came out? What do you say to that? Yes. Unfortunately, we'd have to read the entire depositions of three different people to get at that. But in my reading, it is clear that she was supposed to have attempted. She was, according to my client, was asked to help and actually provided the ladder. And although she didn't set up the ladder, she was standing by to help. And she acknowledges that she was standing near, and so the facts go on and on and they get cloudier and cloudier, but they won't be cloudy at trial because these are depositions. But looking at this particular case, I mean, you have a sympathetic case, but just trying to apply the law that controls us. First standing by as he got in is not anything that contributed to the accident. So regardless of that dispute, I don't see where it's material. Maybe it is. You tell me why it might not be. But it seems to me from your client himself, and maybe the salesperson confirmed it, is that she was 20 or 40 feet away on the phone and so was not assisting, and that's when the accident occurred. Isn't that the key thing that has to be in dispute? I believe providing the ladder was the assistance that wasn't supposed to be given. I think that's the policy. The policy can't be broken down into microseconds and evaluated that way. It has to be looked at in general. I mean, because they are trying to save money. They're trying to eliminate tort liability by creating a danger, which is the irony of this. And what you say, it seems to me, is supported by opposing counsel's last statements, which is that these ladders weren't just set out there and available for customers to freely take and use but that they were kept away somewhere sort of more available to the employees, but that that would indicate even more that the policy was not to have ladders available for customers. That providing them and the degree to which additional assistance other than providing is a violation of the policy. And so we ask that the summary judge would probably be back here again, Your Honors, with me trying to reverse a judgment. I recognize that. It's only been ten years since Katrina. So it's kept us a lot of good customers from Katrina. We've been up here a great deal, Your Honor. And we understand that this, we understand, in closing I will say this, we understand that the Federal Tort Claims Act is not to belabor the Mr. Goh or the Katrina thing, not opening the floodgates. What this is is a very narrow case in which a small act or failure to act or a violation of a policy is considered, not some broad concept such as flood control, not some broad concept such as canals in the Green case or even in the case that I unfortunately was involved with, Nelson v. Federal, I mean the U.S., which was looking at conduct on the part of the SEC. These were broad ideas. This is very narrow, and we ask that we be allowed to go back and try our case. Thank you. All right. Thank you very much. Now we will stand in recess.